UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ROBERT JOYNER,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **vs.** | **)** | **Case No. 3:20-cv-00054-GCS** |
| | **)** | |
| **VENERIO SANTOS,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| | **)** | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 71). Defendant Santos ("Santos") filed his Motion for Summary Judgment and Memorandum of Support on May 19, 2022. (Doc. 71, 72). In the motion, Defendant argues that "the underlying facts of th[e] case demonstrate [that he] was not deliberately indifferent to [Plaintiff's] injuries or that any action or inaction on his part caused injury to . . . Plaintiff." (Doc. 72, p. 1). Plaintiff timely filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on June 17, 2022. (Doc. 73). Defendant Santos filed a Reply Memorandum of Law in Support of his Motion for Summary Judgment on July 1, 2022. (Doc. 74). For the reasons delineated below, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment.

PROCEDURAL HISTORY

Plaintiff Robert Joyner, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Centralia Correctional Center ("Centralia") brought

suit against Defendants Wexford Health Sources, Inc. ("Wexford"), Lana Nalewaja

("Nalewaja"), Alfonso David ("David"), Venerio Santos ("Santos"), John Baldwin

("Baldwin"), Kym Johnson ("K. Johnson"), Sarah Johnson ("S. Johnson"), Patty Sneed

("Sneed"), Debbie Knauer ("Knauer"), Ann Lahr ("Lahr"), and Susan Walker ("Walker")

pursuant to 42 U.S.C. § 1983. (Doc. 1). In his Complaint, Plaintiff alleges that he received

inadequate medical care for his hemorrhoids and rectal bleeding, as well as for pain in

his throat, chest, and abdomen beginning in January 2018. (Doc. 1, p. 9-15). On March 16,

2020, the Court completed its preliminary review of Plaintiff's Complaint pursuant to 28

U.S.C. § 1915A. (Doc. 10). The Court construed Plaintiff's allegations into the following

count:

> **Count 1:** Dr. David, Venerio Santos, Lana Nalewaja, John Baldwin, Kym
> Johnston, Sarah Johnson, Patty Sneed, Debbie Knauer, Ann Lahr, Susan
> Walker, and Wexford Health Sources, Inc. were deliberately indifferent
> under the Eighth Amendment to Plaintiff's complaints of pain and bleeding
> rectum.

(Doc. 10, p. 3). However, all Defendants, apart from David and Santos were dismissed

without prejudice from the action due to Plaintiff's failure to state a claim. (Doc. 10, p. 4).

Neither of the remaining Defendants filed a Motion for Summary Judgment on the Issue

of Exhaustion of Administrative Remedies and the case proceeded to consideration on

the merits. (Doc. 32). However, on July 31, 2020, Defendant David filed a Motion to

Dismiss for Failure to State a Claim along with a Memorandum of Support. (Doc. 33, 37).

The Court granted David's Motion to Dismiss and dismissed Plaintiff's claims against

David with prejudice. (Doc. 42). As such, Defendant Santos is the only Defendant

remaining.

BACKGROUND

**A.  Plaintiff's Gun Shot Incident & Mental Health**

Plaintiff has been incarcerated in an IDOC correctional center since 2006.[1] (Doc. 73, Exh. 2, p. 5:13-14). Prior to his incarceration, Plaintiff was the victim of a shooting incident that occurred in 1998. *Id.* at p. 3:6-9. Plaintiff was shot 6 times in the hip and spine while he was attempting to assist a woman being carjacked. *Id.* at p. 3:21-24; (Doc. 73, p. 10). Following the shooting, Plaintiff underwent surgery to treat his injuries at Christ Hospital. *Id.* at p. 4:9. Plaintiff had an intramedullary rod placed in his left femur and exploratory surgery on his abdomen to address an injury to one of his kidneys. *Id.* at p. 3:21-24; (Doc. 73, p. 10). A Jackson-Pratt[2] drain was implanted on the opposite side of Plaintiff's liver to address any lingering internal bleeding after the exploratory surgery. (Doc. 73, p. 10; Doc. 73, Exh. 2, p. 6:20-21).

As a result of this incident, Plaintiff claims that he suffers from post-traumatic stress disorder ("PTSD"). (Doc. 73, Exh. 2, p. 2:3-16). Plaintiff was also diagnosed as having schizoaffective disorder by Qualified Mental Health Provider ("QMHP") Staci Murray on February 23, 2018. (Doc. 72, Exh. 1, p. 4). This diagnosis was confirmed by psychiatrist, Dr. Michael Bednarz on April 3, 2018. *Id.* at p. 6. The psychiatric progress

---

[1]      Prior to arriving at Centralia Correctional Center, Plaintiff was incarcerated in Shawnee Correctional Center until mid-February 2018. (Doc. 72, p. 1). The record does not indicate whether Plaintiff has been housed at any other additional facilities.

[2]      A Jackson-Pratt drain is used to address any "contin[uos] oozing and shedding of cells and bodily fluid" following surgery. The drain "removes fluid" and "speeds healing." When the bulb of the drain is compressed, the drain suctions fluid out of the body automatically. *See* Cleveland Clinic, Health Library, "How to Care for the Jackson-Pratt Drain", https://my.clevelandclinic.org/health/articles/21104-how-to-care-for-your-jackson-pratt-drain (last visited Feb. 15, 2023).

note from the April 3rd appointment states that Plaintiff "continues to have fixed delusion[s] that a device has been inserted into his abdomen the last time he had surgery in 1998." *Id.* Plaintiff believes that this device or another device implanted during the 1998 surgery is causing his gastrointestinal issues, headaches, and esophageal problems. (Doc. 72, Exh. 3, p. 2:15-25). Plaintiff was proscribed and is still taking medications to address his mental health symptoms. (Doc. 72, Exh. 1, p. 6; Doc. 72, Exh. 3, p. 20:20). During his deposition, Defendant Santos indicated that a patient's history of "delusions" does not change how he views "what they're telling him about their symptoms." (Doc. 73, Exh. 1, p. 12:20-23).

### B. Plaintiff's Physical Care at Centralia Correctional Center

The medical records documenting Plaintiff's care date back to February 2018.[3] (Doc. 72, Exh. 1). Plaintiff visited the Centralia Health Care Unit ("HCU") on February 4, 2018. (Doc. 72, Exh. 1, p. 1). At this visit, Plaintiff was seen by an unknown doctor (signature illegible). *Id.*; (Doc. 72, p. 2). Plaintiff complained that he had been experiencing chest pain "for many years" allegedly caused by an electronic "transmitter in his body." (Doc. 72, Exh. 1, p. 1). Plaintiff also reported that he had previously received no

---

[3]     A radiology report dated June 17, 2014, was also attached as one of Plaintiff's exhibits. The report indicates that Plaintiff had been complaining of chest pain and that he "fe[lt] like [he was] choking." X-rays of the abdomen and chest were reportedly taken on June 16, 2014. The three images of the abdomen revealed that Plaintiff's gas pattern was normal; that there were no renal calculi; and that there was a metallic density "which may be a bullet fragment" projecting along the superolateral aspect of Plaintiff's right hip. Two separate images were taken of Plaintiff's chest. The x-rays revealed that Plaintiff's heart was of normal size; that there was "strand density" in the right pulmonary base "which may be due to atelectasis or fibrosis"; and an asymmetric elevation or eventration of the right hemidiaphragm. (Doc. 73, Exh. 3, p. 1).

medication for the pain. *Id.* In response, the unknown doctor referred Plaintiff to the mental health department and proscribed him Pepcid for heartburn relief. *Id.*

Plaintiff returned to the HCU on February 15, 2018. (Doc. 72, Exh. 1, p. 2). Plaintiff was seen by Nurse Shaw ("Shaw") and complained of sharp chest pains. *Id.* Plaintiff reported to Shaw that he had been experiencing episodes of sharp chest pain for the past year and that the pain would occur during activity or rest. *Id.* Plaintiff also indicated that the pain would wake him from sleep. *Id.* Plaintiff rated the pain of these episodes as a 10 on the pain scale and noted that he had been experiencing nausea, dizziness, vomiting, and shortness of breath in conjunction with the episodes. *Id.* Upon examination, Shaw found Plaintiff's lungs to be clear and his vital signs normal. *Id.* at p. 3.  Shaw referred Plaintiff to a doctor for further evaluation. *Id.*

Plaintiff was first seen by Defendant Dr. Santos ("Santos") on April 10, 2018, for abdominal pain. (Doc. 72, Exh. 1, p. 8). Plaintiff complained of irregular bowel movements, and he reported that he sustained injuries to his abdomen in 1998 from a gunshot wound. *Id.*  Santos examined Plaintiff and found that he was not in distress, had no heart murmurs or rails in the lungs, and had bowel sounds plus two with a healed scar on his abdomen. *Id.* Santos assessed Plaintiff as status-post gunshot wound to the abdomen with a history of bowel obstruction. *Id.* He ordered a Kidney, Ureter, and Bladder ("KUB") x-ray of Plaintiff's abdomen and planned a follow up visit to discuss the results. *Id.* at p. 9.

OneRadiology took the KUB x-ray as ordered on April 11, 2018. *Id.* at p. 9. The x-ray found that the "visualized bowel gas" was unremarkable and that no "abnormal

calcifications were seen in the abdomen or pelvis." *Id*. Pelvic phleboliths were also found to be present. *Id*.  No radiopaque foreign bodies were seen nor was any bowel dilation identified. *Id*. Although the x-ray indicated that there was a limited field of view, the x-ray did not locate any acute findings. *Id*.

Dr. Santos had a follow up visit with Plaintiff on May 1, 2018. (Doc. 72, Exh. 1, p. 10). At the visit, Plaintiff voiced no concerns. *Id*. Santos examined Plaintiff, noted his history of a gunshot wound to the abdomen, and observed that his abdomen was soft and non-tender with normal bowel sounds. *Id*. Dr. Santos reportedly reviewed the KUB x-ray results and counseled Plaintiff. *Id*. During the counseling, Santos indicated to Plaintiff that the x-ray results were normal and there was no evidence of obstruction. *Id*. Plaintiff disputes that he was ever shown or given any information about these x-rays. (Doc. 73, Exh. 2, p. 8:20-25).

On May 4, 2018, Dr. Santos saw Plaintiff to assess his complaints of an unresolved sore throat with ear pain. (Doc. 72, Exh. 1, p. 11). Santos examined Plaintiff and observed that his throat was congested and red and that his ear canal was obstructed with wax. *Id*. However, Plaintiff's heart and lung sounds were determined to be normal. *Id*. Dr. Santos diagnosed Plaintiff with an acute respiratory tract infection and bilateral impacted

cerumen[4]. *Id.* Santos ordered Amoxicillin, a Debrox protocol[5], and instructed Plaintiff to increase his fluid intake. *Id.*

X-rays of Plaintiff's chest were subsequently ordered by Dr. Santos. (Doc. 72, Exh. 1, p. 12). On May 5, 2018, OneRadiology took the x-rays as ordered. *Id.* The x-rays revealed a "slight asymmetric elevation of the right hemidiaphragm." *Id.* No active infiltrate was seen, but "minimal subsegmental atelectasis" was identified as being possibly present at the lung bases. *Id.* The x-rays further showed that Plaintiff's heart was not enlarged and that there was no sign of pleural effusion or pneumothorax. *Id.*

Plaintiff saw Dr. Santos again on May 25, 2018, for a sore throat and ear pain. (Doc. 72, Exh. 1, p. 13). Santos examined Plaintiff and noted that his ear drum was intact with no drainage seen in the throat. *Id.* Dr. Santos assessed Plaintiff as having an upper respiratory tract infection and continued his previously proscribed antibiotic treatment plan. *Id.*

Dr. Santos had another visit with Plaintiff on May 31, 2018. (Doc. 72, Exh. 1, p. 14). Dr. Santos observed that Plaintiff was alert and in no apparent distress. *Id.* Dr. Santos reviewed Plaintiff's May 8th x-ray results with Plaintiff, indicating "x-ray film shown" in his medical note. *Id.* Santos's assessment of the May 8th x-ray was that the images showed

---

[4]     Cerumen impaction is the medical term for earwax blockage. *See* Cleveland Clinic, Health Library, "Earwax Blockage", https://my.clevelandclinic.org/health/diseases/14428-ear-wax-buildup--blockage (last visited Feb. 15, 2023).

[5]     Debrox is one of the hydrogen peroxide or peroxide based ear drops commonly used to dissolve ear wax in the ear canal. *See* Cleveland Clinic, Health Library, "Earwax Blockage", https://my.clevelandclinic.org/health/diseases/14428-ear-wax-buildup--blockage (last visited Feb. 15, 2023).

"segmental atelectasis in the lungs." *Id.* Santos instructed Plaintiff to do deep breathing exercises to manage his symptoms. *Id.*

Plaintiff's next visit with Dr. Santos occurred on November 5, 2018. (Doc. 72, Exh. 1, p. 16). Plaintiff complained of irritation of the urethra for five days, which followed an incident where he submerged his penis in toilet bowel water. *Id.* Santos examined Plaintiff and found no urethral discharge or skin lesions. *Id.* A prior urinalysis done by a nurse before the appointment was negative. *Id.* Dr. Santos diagnosed Plaintiff with non-specific urethritis, ordered Bactrim, and advised Plaintiff to increase his fluid intake. *Id.*

On December 16, 2018, Plaintiff presented to the HCU with abdominal and chest pain. (Doc. 72, Exh. 1, p. 17-18, 19-20). As to the abdominal pain, Plaintiff reported that he had been suffering from abdominal cramps and bloody stools for years. *Id.* at p. 17. Upon examination, Plaintiff's abdomen was soft and non-tender. *Id* at p. 18. As to the chest pain, Plaintiff reported that stabbing pain ran from his "heart to his throat" and "comes and goes" without explanation. *Id.* at p. 19. In both medical notes, the HCU recommended that a call be placed to Dr. Siddiqui. *Id.* at p. 18, 20.

Dr. Santos next saw Plaintiff on December 19, 2018, to address the complaints of chest and abdominal pain. (Doc. 72, Exh. 1, p. 21). Plaintiff voiced no concerns during this encounter, and Santos observed that Plaintiff was in no apparent distress. *Id.* Dr. Santos found that Plaintiff had no heart murmurs and had clear and resonant lungs with no rails. *Id.* Santos assessed Plaintiff as having non-specific chest pain and that he be released from the HCU. *Id.* Santos also advised that Plaintiff continue with all previously proscribed medications and follow up in five days. *Id.*

On March 31, 2019, Plaintiff reported pain in his rectum, abdomen, and knee to a nurse at Centralia. (Doc. 73, Exh. 3, p. 4). Plaintiff reported to the nurse that he had experienced this pain before and that nothing had ever been done about it. *Id.* Plaintiff also reported that he was having roughly two bowel movements per day and that blood was present in his stool during each bowel movement. *Id.* The nurse placed Plaintiff in the M.D. line for a physician to follow-up on Plaintiff's concerns. *Id.*

On April 2, 2019, Plaintiff saw Defendant Dr. Santos pursuant to the nurse's recommendation. (Doc. 72, Exh. 1, p. 22). Plaintiff reportedly informed Santos that he had suffered from rectal bleeding from hemorrhoids for years. *Id.* Upon examination, Santos observed that Plaintiff was alert and in no clear sign of distress; he also had a normal heart and lung examination, positive bowel sounds, and no palpable masses in his abdomen. *Id.* Santos assessed Plaintiff as having internal hemorrhoids and degenerative joint disease in his left knee. *Id.* Santos's plan of care included replacing Plaintiff's knee sleeve, a hemoccult blood stool test, a KUB x-ray, and Fiberlax laxatives. *Id.* Santos also planned to have a follow up appointment with Plaintiff to discuss the results of the ordered diagnostic testing. *Id.*

Dr. Santos followed up with Plaintiff about his hemorrhoids on April 8, 2019. (Doc. 72, Exh. 1, p. 23). During the visit Santos noted that Plaintiff complained of constipation and occasional bleeding from hemorrhoids. *Id.* Dr. Santos observed that Plaintiff was not in any apparent distress and that his abdomen was soft and tender; he also had positive bowel sounds. *Id.* Santos reported that he reviewed the results of Plaintiff's KUB x-ray and noted that the x-ray was within normal limits. *Id.* Defendant Santos assessed Plaintiff

as being constipated with internal hemorrhoids; he also ordered Colace[6] and counseled him to increase fluids and continue treatment. *Id.*

Plaintiff saw Santos once again on May 14, 2019, for a routine physical examination. (Doc. 72, Exh. 1, p. 49). During the examination, Santos conducted a digital rectal exam on Plaintiff using gloves and a lubricating gel. *Id.* Defendant Santos identified non-thrombosed internal hemorrhoids during the exam. *Id.*

On May 20, 2019, following the rectal exam, Plaintiff saw Nurse Mohmeyers during a nurse sick call to address his complaints of hemorrhoids and rectal bleeding. (Doc. 72, Exh. 1, p. 24). Nurse Mohmeyers examined Plaintiff and found no bleeding around the anal area or signs of trauma but noted Plaintiff's complaints of hemorrhoids. *Id.* Nurse Mohmeyers also noted that "bright red blood" was present in Plaintiff's stool and that the "S/R" hemorrhoid cream protocol was ineffective. *Id.* Upon evaluating Plaintiff, Nurse Mohmeyers referred Plaintiff for a follow up appointment with a physician. *Id.*

Dr. Santos saw Plaintiff for this follow up appointment on May 22, 2019. (Doc. 72, Exh. 1, p. 25). During this visit, Plaintiff complained of occasional rectal bleeding and nasal congestion. *Id.* However, Plaintiff denied that he was suffering from constipation. *Id.* Dr. Santos assessed Plaintiff as having non-thrombosed internal hemorrhoids, ordered Preparation H cream per protocol, directed Plaintiff to increase his fluids, and proscribed 10mg of Claritin for nasal congestion. *Id.* Defendant Santos testified that at this point, he

---

[6]     Colace is a common brand of docusate used as a stool softener. *See* Cleveland Clinic, Health Library, Drugs, Devices and Supplements, "Stool Softener", https://my.clevelandclinic.org/health/drugs/23274-stool-softener (last visited Mar. 2, 2023).

was not concerned about Plaintiff suffering from anemia because it was controlled with an iron supplement. (Doc. 72, Exh. 2, p. 19:12-18).

Plaintiff next saw Dr. Santos on July 1, 2019, to address complaints of abdominal pain and diarrhea. (Doc. 72, Exh. 1, p. 26). Plaintiff had reported that he had been experiencing both bloody and green mucus filled stool to a nurse, who referred Plaintiff to a physician for follow up. (Doc. 73, Exh. 3, p. 7). Plaintiff also reported to the nurse that he had lost five pounds over the course of one week due to the consistent diarrhea. *Id.* During the visit, Plaintiff reported on and off loose bowel movements for one week that occurred four or five times per day. *Id.* Upon examination, Santos found Plaintiff's abdomen to be soft, but tender with pressure to the mid-abdomen. *Id.* Plaintiff's bowel sounds were also found to be somewhat hyperactive. *Id.* Dr. Santos advised Plaintiff to increase his fluid intake and ordered Imodium to treat the diarrhea. *Id.* Santos noted in his deposition that diarrhea can impact hemorrhoids by making them more inflamed. (Doc. 72, Exh. 2, p. 21:18-21).

On August 31, 2019, Plaintiff's stool was tested for blood using a hemoccult test after Plaintiff complained to a nurse of bloody stools, abdominal pain and rectal pain.[7] (Doc. 72, Exh. 1, p. 27; Doc. 73, Exh. 3, p. 9). Plaintiff's hemoccult test was positive for blood, and Dr. Santos followed up with Plaintiff regarding these lab results on September

---

[7]      Plaintiff was assessed twice by a nurse before being seen by Dr. Santos on August 31, 2019. Plaintiff saw a nurse on August 22, 2019, due to pain caused by his hemorrhoids. (Doc. 73, Exh. 3, p. 9). The nurse noted that upon visual inspection, Plaintiff had small protruding hemorrhoids. *Id.* Plaintiff was also seen by a nurse on August 28, 2019, due to abdominal pain (Doc. 73, Exh. 3, p. 10). During this visit, Plaintiff complained of light green and blood stool. Id. Plaintiff also expressed concerns about colon cancer during this visit. *Id.*

3, 2019. *Id.* During the visit, Plaintiff denied that he had suffered from rectal bleeding, but reported a history of abdominal surgery in 1998. *Id.* Dr. Santos then examined Plaintiff and found that he was in no distress and that his heart, lungs, and abdomen were normal. *Id.* Santos assessed Plaintiff as having non-thrombosed internal hemorrhoids that were reducible. *Id*. Dr. Santos advised Plaintiff on proper anal hygiene and ordered that Plaintiff continue to use the Preparation H cream previously proscribed. *Id.* Santos also noted that he would review Plaintiff's older medical records and ordered Complete Blood Count ("CBC") and Basic Metabolic Panel ("BMP") blood tests. *Id.*

Dr. Santos saw Plaintiff once again on October 7, 2019, to evaluate his abdominal pain. (Doc. 72, Exh. 1, p. 28). Plaintiff had complained of the abdominal pain to a nurse on October 4, 2019, stating that he was experiencing vomiting, bloody stools, and an urgency to urinate. (Doc. 73, Exh.3, p. 11). During this visit with Santos, Plaintiff complained of on and off dark stools. *Id.* Dr. Santos examined Plaintiff and found that he had a healthy abdomen, which was soft and non-tender, with positive bowel sounds. *Id.* Dr. Santos also conducted a rectal exam where he found a small external hemorrhoid. *Id.* Santos assessed Plaintiff as having internal hemorrhoids and planned additional hemoccult stool tests; he also proscribed Plaintiff ibuprofen for pain management and advised him on his diet. *Id.*

On October 11, 2019, Dr. Santos saw Plaintiff to follow up on his hemoccult blood tests. Plaintiff had reported dark colored stools during bowel movements. (Doc. 72, Exh. 1, p. 29). Dr. Santos conducted a rectal examination and found that Plaintiff had non-tender and non-thrombosed external hemorrhoids. *Id.* Santos noted that Plaintiff's CBC

blood test was within normal limits and that the hemoccult stool test was positive. *Id.* Dr. Santos discontinued the Feosol, advised the Plaintiff on anal hygiene, directed Plaintiff to increase his fluid intake, and ordered repeat hemoccult blood stool tests and CBC labs after one month. *Id.*

Dr. Santos saw Plaintiff to address his high blood pressure on October 30, 2019. (Doc. 72, Exh. 1, p. 30). Plaintiff also complained about blood in his stool during this visit. *Id.* Dr. Santos found that Plaintiff's abdomen was soft and non-tender with no palpable masses and positive bowel sounds. *Id.* He assessed Plaintiff as having controlled hypertension and ordered Tylenol. *Id.* Dr. Santos also ordered additional hemoccult blood tests and CBC labs to further assess Plaintiff's complaints of bloody stools. *Id.* Santos noted that he would follow up with Plaintiff once he received the results. *Id.*

Dr. Santos followed up with Plaintiff's lab results on November 14, 2019. (Doc. 72, Exh. 1, p. 31). Plaintiff complained of on and off rectal bleeding ranging in color from bright red to dark red since he had suffered from a gun shot wound in 1998. *Id.* Dr. Santos examined Plaintiff and found that he was not actively bleeding as indicated by the hemoglobin values in the repeat CBC labs. *Id.* However, two of Plaintiff's hemoccult samples came back positive and contained frank blood. (Doc. 73, Exh. 3, p. 16). Within the M.D. note, Defendant Santos noted Plaintiff's historic hemoglobin levels. *Id.* Santos reported that Plaintiff's hemoglobin levels were: 13.6 in April 2019, 14.1 in August 2019, 13.7 in September 2019 and 12.0 in November 2019. *Id.* Defendant Santos testified that a normal range for a male's hemoglobin is between 13.2 and 18. (Doc. 72, Exh. 2, p. 22: 9-14). Dr. Santos assessed Plaintiff as having rectal bleeding and ordered a repeat blood

test, Feosol Iron tablets, B12 vitamins, Folic Acid pills, and Tylenol. *Id.* Santos noted that he intended to follow up with Plaintiff in two weeks' time. *Id.*

Plaintiff's follow-up visit with Dr. Santos occurred on November 27, 2019. (Doc. 72, Exh. 1, p. 32). During the visit, plaintiff still complained of blood in his stool. *Id.* Dr. Santos's physical exam found that Plaintiff's heart and lungs sounded normal, that his abdomen was soft and non-tender with positive bowel sounds, and that there were no palpable masses. *Id.* Dr. Santos also conducted a rectal exam on Plaintiff. *Id.* The rectal exam revealed that Plaintiff's sphincter had good tone and that his internal hemorrhoids were not bleeding. *Id.* Defendant Santos discontinued Plaintiff's iron tablets and planned to refer Plaintiff to collegial review for a possible colonoscopy. *Id.*

Following Plaintiff's follow-up visit on November 27, 2019, Dr. Santos referred Plaintiff for a consultation with a gastroenterologist. (Doc. 72, Exh. 1, p. 38). Dr. Santos indicated that he was making the referral because Plaintiff had complained of a gastrointestinal bleed for one month; he also had positive hemoccult stools and hemorrhoids. *Id.* The referral was approved on December 18, 2019. *Id.*; (Doc. 72, Exh. 4, p. 1).

Dr. Santos then saw Plaintiff again following his medical furlough on December 20, 2019. (Doc. 72, Exh. 1, p. 34). In his M.D. note, Defendant Santos noted that Plaintiff had no complaints and that the outside gastroenterologist who saw Plaintiff recommended that he undergo an esophagogastroduodenoscopy ("EDG"), as well as a colonoscopy. *Id.* Dr. Santos's treatment plan was to follow the recommendations of the

gastroenterologist. *Id.* Plaintiff's EDG and colonoscopy were approved on December 27, 2019. (Doc. 72, Exh. 1, p. 39).

On January 30, 2020, Plaintiff underwent a colonoscopy performed by Dr. Merrilee Brandt at St. Mary's Hospital in Centralia, Illinois. (Doc. 72, Exh. 1, p. 43-44). The colonoscopy showed Grade 3 internal and external hemorrhoids along with some inflammation. *Id.* No fissures, polyps or other lesions in the abdomen were identified. *Id.* at p. 43. Biopsies were taken from the duodenum, the antrum, the GE junction, and the esophagus. *Id.* The biopsied tissue was then sent to pathology for analysis. *Id.* No evidence of cancer was identified in the pathology report, but the tissue samples exhibited characteristics consistent with mild gastropathy. (Doc. 72, Exh. 1, p. 41-42).

Plaintiff saw Dr. Santos following his colonoscopy on February 14, 2020, to address complaints of his hemorrhoids worsening. (Doc. 72, Exh. 1, p. 35). Dr. Santos noted Plaintiff status as post EGD and colonoscopy and assessed him as having gastritis and internal/external hemorrhoids. *Id.* Defendant Santos counseled Plaintiff to increase fluids; he also ordered Fiberlax, Prilosec, and daily Preparation H suppositories. *Id.* Defendant Santos testified that Dr. Brandt's findings from the colonoscopy did not explicitly include a recommendation for surgery on Plaintiff's Grade 3 hemorrhoids. (Doc. 72, Exh. 2, p. 32:20 – 34:10). However, Santos also testified that hemorrhoids could be considered to require surgery when they are "bothering the patient." *Id.* at p. 33:17. Santos further testified that he was aware that Plaintiff was experiencing severe pain and discomfort from his hemorrhoids at this time. *Id.* at p. 34:1-3.

Dr. Santos subsequently retired from his position at Centralia in May 2020 and thereafter worked intermittently visiting correctional facilities until January 2021. (Doc. 72, p. 2:11-18). Santos then undertook a *pro re nata* position for one month at Graham Correctional Facility when the acting medical director retired in January 2021. *Id.* at p. 2:19-24. Plaintiff's care was then undertaken by Dr. Jodi Pelegrin. (Doc. 72, Exh. 1, p. 36).

Plaintiff saw Dr. Pelegrin on October 23, 2020, for a check-up, where he complained of tarry stools. *Id.* She noted that Plaintiff reported that his hemorrhoid cream was not helping and that he takes his Fiberlax and iron supplements daily as proscribed. Further, she noted that Plaintiff's bloodwork revealed hemoglobin levels of 12.1 on March 14, 2020, and 8.4 on August 28, 2020. *Id.* She also noted Plaintiff's long history of hemorrhoids and anemia. *Id.* Dr. Pelegrin ordered 3 hemmocult stool samples, a CBC, and an iron panel. *Id.* She also instructed Plaintiff to continue the iron and hemorrhoid suppositories and noted that she intended to send Plaintiff to gastroenterology for a consult. *Id.*

Plaintiff subsequently underwent a hemorrhoidectomy at St. Mary's Hospital in Centralia, Illinois, on April 19, 2021. (Doc. 72, Exh. 5, p. 1-2). The surgeon noted that the largest hemorrhoid was in the right anterior region, but that Plaintiff had significant dilated hemorrhoids in all three positions. *Id.* Further, the surgeon noted that the hemorrhoids extended proximally for at least 3 cm in distance. *Id.* Two of the hemorrhoids were excised and banded. *Id.*

Plaintiff underwent a second hemorrhoidectomy on October 14, 2021. (Doc. 72, Exh. 5.). The surgeon noted that Plaintiff had previously underwent a hemorrhoidectomy

for prolapsing hemorrhoids, but that he continued to have episodic prolapse and bleeding. *Id.* The surgeon further noted that Plaintiff was not anemic as he was prior to the first surgery. *Id.*

In his deposition, Plaintiff stated that from the time he arrived at Centralia in 2018 until his hemorrhoidectomy surgeries performed in 2021, that he experienced significant pain from his hemorrhoids and rectal bleeding. (Doc. 72, Exh. 2, p. 19:17-20:10). Plaintiff described the pain as "excruciating." *Id.* at p. 20:8. Plaintiff noted that his hemorrhoids caused him to experience pain while going about his basic daily activities, which included sitting down, using the bathroom, and sleeping. *Id.* at 19:20-20:1. Plaintiff further noted that enduring this pain negatively impacted his mental wellbeing. *Id.* at p. 20:19.

### C.  Care Plans for Hemorrhoids at Central Correctional Center

One common component of treatment for hemorrhoids is a sitz bath. (Doc. 72, p. 8). A sitz bath is a process in which a patient suffering from hemorrhoids can sit in a warm basin of water to relieve pain. *Id.* Dr. Santos testified in his deposition that sitz baths are a treatment available to inmates in their housing units. (Doc. 72, Exh. 2, p. 12:7-11). He further testified that sitz baths are prescribed if the hemorrhoids are "really painful." *Id.* Santos also stated that there would be no reason why he would deny a patient a sitz bath. *Id.* at p.12:15-16. Dr. Santos indicated that prescribing a sitz bath is a typical "part of the counseling" for inmates that are experiencing hemorrhoids. *Id.* at p.20:7. He also noted that the typical counseling contains a recommendation for inmates to use a warm towel or heating pad for further relief. *Id.* at p. 20:11-13. Santos testified that he has no reason to believe that he deviated from the standard counseling procedure

in this case. *Id.* at p. 20:20. However, Plaintiff testified in his deposition that Dr. Santos denied him access to a sitz bath as a treatment option. (Doc. 72, Exh. 3, p. 13:2-4). When Plaintiff asked Dr. Santos about the sitz bath treatment, Santos allegedly told Plaintiff that "we don't do that here." *Id.* This caused Plaintiff to believe that sitz baths were unavailable to inmates at Centralia Correctional Center.

Dr. Santos also elaborated on the medication protocol for the treatment of hemorrhoids in his deposition. Santos testified that there are two separate cream-based protocols for treating hemorrhoids at Centralia Correctional Center. (Doc. 72, Exh. 2, p. 18:13-15). Santos noted that medical practitioners use Anusol cream initially and then move to using Preparation H cream when that proves to be ineffective. *Id.* at p. 18:17-21. Defendant Santos indicated that the difference between Anusol and Preparation H is that the latter contains hydrocortisone while the former does not. *Id.* at p. 18:20-24. Dr. Santos stated that he proscribed Plaintiff with Preparation H cream on May 22, 2019, in response to the Anusol cream being ineffective. *Id.* p. 19:1-3. Plaintiff testified that at some point, he indicated the hemorrhoid creams were ineffective and that Santos did nothing in response. (Doc. 73, Exh. 3, p. 18:1-14). When Plaintiff inquired about other treatment options, Santos reportedly told Plaintiff that further interventions were "too expensive." *Id.* Santos also noted that when both topical hemorrhoid creams are ineffective, that the next step in the care plan protocol is to proscribe the inmate daily hemorrhoidal suppositories. *Id.* at p. 30:6-9. Santos proscribed Plaintiff Preparation H suppositories during their visit on February 14, 2020. (Doc. 72, Exh. 1, p. 35).

LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial.

*See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## DISCUSSION

A prisoner, like Plaintiff, seeking to establish that the medical care he received in prison was so insufficient as to violate his Eighth Amendment rights must prove that: (1) he had an objectively serious medical need; and (2) the defendant prison official was deliberately indifferent to that need. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). *See also Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996); *Thomas v. Walton*, 461 F. Supp.2d 786, 793 (S.D. Ill. 2006). In this

case, Defendant does not dispute that Plaintiff's pain in his chest, throat, abdomen, and rectum constitute objectively serious medical conditions. (Doc. 72, p. 16-19). Rather, Defendant's contention is that no reasonable trier of fact could find that the Defendant's handling of Plaintiff's conditions constituted deliberate indifference. *Id.* Therefore, the Court will proceed to analyze Plaintiff's assertion that Defendant Dr. Santos's treatment of Plaintiff amounted to deliberate indifference.

For Plaintiff to properly assert that Defendant was deliberately indifferent to his serious medical needs, he must show that Defendant had subjective knowledge of - and then disregarded – an excessive risk to his health. *See Greeno*, 414 F.3d at 653. While Plaintiff does not need to show that Defendant "literally ignored" his complaint, he is required to demonstrate that Defendant was aware of his medical condition and that Defendant either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). *See also Hammond v. Rector*, 123 F. Supp.3d 1076, 1086 (S.D. Ill. 2015)(noting that "isolated occurrences of deficient medical treatments are generally insufficient to establish . . . deliberate indifference"). Rather, deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Plaintiff first asserts that Defendant Dr. Santos was deliberately indifferent to Plaintiff's complaints of pain in his chest, throat, and abdomen because Santos allegedly

failed to treat these conditions properly. (Doc. 73, p 15-16). Plaintiff acknowledges that Santos's treatment alleviated Plaintiff's throat and chest pain but noted that his abdominal pain persisted. *Id*. at 15. Still, Plaintiff asserts that Defendant Santos's alleged failure "to review the results of any imaging with [Plaintiff]" and Defendant's failure "to show [Plaintiff] the results of any imaging" constitute deliberate indifference because Defendant Santos thereby "refused to investigate [Plaintiff's] source of pain." *Id*. The Court disagrees. "The fact that Plaintiff did not get a satisfactory explanation of his test results does not establish deliberate indifference." *See Miller v. Rauner*, No. 17-cv-859-NJR, 2017 WL 4284568, at *5 (S.D. Ill. Sept. 27, 2017).

Even if this were not the case, Plaintiff's medical records clearly demonstrate that Defendant Santos adequately treated Plaintiff's chest, throat, and abdominal pain.[8] Defendant repeatedly ordered KUB x-rays of Plaintiff's abdomen for the purpose of diagnosing the reported pain in that area. (Doc. 72, Exh. 1, p. 9, 22). Each of Plaintiff's KUB x-ray results was within normal limits. *Id*. Further, Defendant Santos proscribed Plaintiff Imodium, Pepcid, and Fiberlax when Plaintiff experienced episodes of abdominal pain; he also counseled Plaintiff on his diet to alleviate the symptoms. (Doc. 72, Exh. 1, p. 1, 22, 35; Doc. 73, Exh. 3, p. 7). Additionally, when Plaintiff's colonoscopy and EDG were performed, it only confirmed Dr. Santos's initial diagnosis, *i.e.*, that Plaintiff's abdominal pain was related to "mild gastropathy" commonly seen with the

---

[8]    The Court acknowledges that Plaintiff has a history of mental health concerns. However, regardless of Plaintiff's belief about the origin of the cause of his physical symptoms, adequate investigation and treatment of those symptoms are required.

usage of NSAIDS or alcohol or associated with bile reflux. (Doc. 72, Exh. 1, p. 40). Dr. Santos's treatment of Plaintiff was consistent with this finding.

Defendant also sufficiently addressed Plaintiff's intermittent throat and chest pains. Plaintiff's chest pain was determined to be "non-specific", and Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD"). (Doc. 72, Exh. 1, p. 21). Plaintiff was proscribed Pepcid, and Dr. Santos suggested diet modifications to address Plaintiff's GERD diagnosis. X-rays of Plaintiff's lungs were also ordered. (Doc. 72, Exh. 1, p. 12). Lastly, when Plaintiff experienced throat pain, Plaintiff was proscribed Amoxicillin. (Doc. 72, Exh. 1, p. 11). While Plaintiff may not have received the care that he desired to receive, only care that is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition" qualifies as deliberate indifference. *See Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020)(quoting *Pyles*, 771 F.3d at 409). Defendant Santos's treatment of Plaintiff's abdominal pain, throat pain, and chest pain do not rise to this level. Therefore, as to Plaintiff's throat, stomach, and chest pains, Defendant's Motion is **GRANTED**.

Next, Plaintiff asserts that Defendant Santos's care of Plaintiff's hemorrhoids and rectal pain amounted to deliberate indifference because Santos knew that his treatments were ineffective and because he did not refer Plaintiff to a specialist sooner. (Doc. 73, p.16-20). In response, Defendant asserts that Plaintiff has failed to put any verifying evidence in the record that establishes Plaintiff suffered from a detrimental effect from any alleged delay in medical treatment. (Doc. 72, p. 18) (citing *Langston v. Peters*, 100 F.3d 1235, 1240

(7ᵗʰ Cir. 1996)). Defendant also notes that the decision of whether or not to use diagnostic testing (such as a colonoscopy) is a decision left for a prison physician's independent medical judgment and does not amount to deliberate indifference so long as the inmate does not face a serious risk to his health. *Id.* (citing *Jones v. Natesha*, 233 F. Supp.2d 1022, 1029-30 (N.D. Ill. 2002)). Here, the Court believes that by construing the facts and all reasonable inferences in Plaintiff's favor, a jury could conclude that Dr. Santos's treatment of Plaintiff's rectum pain and hemorrhoids amounted to deliberate indifference.

Plaintiff initially reported that he was suffering from rectal pain and hemorrhoids on March 31, 2019. (Doc. 73, Exh. 3, p. 4). Dr. Santos first saw Plaintiff for these symptoms on April 2, 2019. (Doc. 72, Exh. 1, p. 22). From April 2019 through February 2020, Defendant Santos cared for Plaintiff's rectal pain and hemorrhoids. During this time period, Santos did alter his treatment plan. Initially, Santos utilized Anusol cream to treat Plaintiff's hemorrhoids and then switched to Preparation H cream on May 22, 2019, once that proved to be ineffective. (Doc. 72, Exh. 1, p. 25). Defendant again altered his treatment plan to include Preparation H suppositories on February 14, 2020. *Id.* at p. 35. Defendant Santos also supplied Plaintiff with iron tablets when his hemoglobin levels dropped. The nine months between Santos proscribing the Preparation H Cream to the

next iteration of treatment, during which Plaintiff's condition objectively worsened could be found to indicate deliberate indifference.

Deliberate indifference can be established when a Plaintiff experiences an "inexplicable delay" in responding to an inmate's serious medical condition. *See Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). This is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering. *See Williams v. Liefer*, 491 F.3d 710, 715-716 (7th Cir. 2007). Between May 2019 and February 2020, Plaintiff endured significant pain and Defendant Santos continued to proscribe a hemorrhoid cream protocol even though Plaintiff's condition continued to worsen – as demonstrated by Plaintiff's declining hemoglobin levels and weight loss. (Doc. 73, Exh. 3, p. 7, 16). Additionally, Plaintiff testified that at some point, when he indicated that the hemorrhoid creams were ineffective, that Santos did nothing in response to alter his treatment protocol. (Doc. 73, Exh. 3, p. 18:1-14). When Plaintiff inquired about other treatment options at this time, Santos reportedly told Plaintiff that further interventions were "too expensive." *Id.* The delay in altering the treatment plan for nine months could therefore amount to deliberate indifference.

Alternatively, deliberate indifference may be found after Dr. Santos received the results of Plaintiff's EDG and colonoscopy. On January 30, 2020, Plaintiff underwent a colonoscopy and EDG. (Doc. 72, Exh. 1, p. 43-44). Dr. Merilee Brandt indicated that Plaintiff suffered from Grade 3 internal and external hemorrhoids. *Id.* During his deposition, Dr. Santos admitted that he was aware that these hemorrhoids were causing

Plaintiff significant discomfort at this time. Dr Santos also admitted that Grade 3 hemorrhoids require surgery at some point and then clarified that "actually, any [hemorrhoids] – if it's bothering the patient [can require surgery]." This indicates to the Court that Defendant was not providing Plaintiff with care that in his professional judgment met the appropriate standard of care. "When a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020). S*ee also Petties*, 836 F.3d at 731 (stating that ". . . where evidence exists that the defendant knew better than to make the medical decision that they did, a jury should decide whether or not defendants were actually ignorant to the risk of harm they caused."). Defendant Santos's stated opinion and his care of Plaintiff are contradictory; therefore, a jury should decide whether his decision-making amounts to deliberate difference in this case. Thus, as to Defendant Santos's treatment of Plaintiff's rectal pain and hemorrhoids, the Motion for Summary Judgment is **DENIED.**

## CONCLUSION

Accordingly, the Court **GRANTS in Part and DENIES in Part** the Motion for Summary Judgment filed by Defendant Venerio Santos. (Doc. 71). The Court **GRANTS** the Motion regarding Plaintiff's claims of chest, throat, and abdominal pain. However, the Court **DENIES** the Motion as to Plaintiff's claims concerning rectal pain and hemorrhoids. The Court **DIRECTS** the Clerk of Court to enter judgment reflecting the same at the conclusion of the case.

**IT IS SO ORDERED.**

**DATED:  March 27, 2023.**

Digitally signed by
Judge Sison
Date: 2023.03.27
10:58:02 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**